cases number 19-1306-19-1347 58 Swansea Mall Drive LLC v. Gator Swansea Property LLC Thank you. Mr. Shapiro, good morning. Good morning, Your Honors. I'm Robert Shapiro along with John Owen of Chapman Spangola. We represent the defendant, landlord, and owner of Gator Swansea Mall Drive LLC. Gator in this dispute against the ground lease tenant, plaintiff, 58 Swansea. If permitted, I'd like to reserve three minutes for rebuttal. You may. In this case, the tenant, 58 Swansea, was looking to take a loan that would be secured by a mortgage on its leasehold interest in the property. The lender, United Bank, wanted assurance that it would have first priority rights to insurance proceeds under the property's casualty insurance policy. United Bank insisted that Gator sign what is referred to in the case as a Section 3N document by which Gator would agree that the bank would have those insurance rights. United Bank would not fund the loan without that agreement. On the other hand, Gator did not and would not sign that agreement because those rights already belonged to Gator under the ground lease. 58 Swansea sued trying to force Gator to sign the 3N agreement that the United Bank had proposed. After trial, the court found for Gator that it was not obligated to sign the 3N proposed by United Bank and also later determined Gator was the prevailing party. However, the district court denied Gator's request for attorney's fees. Today I will cover the three issues on this appeal. First, Gator should be awarded its fees because of the fee shifting provision in the ground lease here. Second, 58 Swansea's cross appeal is without merit because the district court's findings were well supported by the evidence. And third, the district court should not have dismissed counterclaims based on 58 Swansea's unauthorized use of a pylon sign post at the property. On the attorney's fees issue, Gator must be awarded its fees under Article 13 as it defeated all of 58 Swansea's claims against it. In fact, both parties, 58 Swansea and Gator, argued to the district court at different times in this litigation that Article 13 entitles a successful defendant sued under the lease to recover its attorney's fees. The district court found Gator was not obligated to sign an agreement that might affirm that United Bank had first priority to the insurance proceeds that Gator itself wanted. So that's a finding that Gator didn't breach. No, in this case it does fit because 58 Swansea instituted this action by reason of claiming that Gator was in default. That's different than its default. But Article 13 includes a defense. It says if the party that successfully defends the action instituted by reason of default can get their attorney's fees, the term defense must mean something. As in DiGiovanni, which the Mass Appellate Court decided three separate times, also that when there's a successful defense under Article 13, they're entitled to attorney's fees. So in this particular case, because the action was instituted by reason of default and Gator successfully defended. But how was it instituted by reason of Swansea's default? No, it's instituted by reason of Gator's default. That's what their claim was. Right, but the attorney's fees provide when it's instituted by reason of the other party's default, right? No, it just says in any action instituted by reason of default. But there was no default here. What? Well, there is a default for a moment, but I'll get to that. But as a pure prevailing, one interpretation as a pure prevailing party provision in this context, the fact that it allows for a successful defense, a successful defendant to obtain attorney's fees, must be, you know, considered. And when the leasing as a whole is considered, the issue here is that a party cannot sue another party and lose and not be liable for the attorney's fees. Otherwise, sort of what happened here will continue to happen, which is there's no disincentive to claim the other party's default and try to get the other party to capitulate against the threat and risk of fees. You don't – the purpose of the provision, like any other fee-shifting provision, is the same as – Well, if the purpose were the same as other fee-shifting provisions, the parties would have put in the normal fee-shifting language instead of this narrower language. So if purpose were as you said, then the language would be different than what you have here. No – well, yes, that would make it simpler to be a traditional prevailing party provision. But actually, by using defaulting party, it was less than – it's even broader than prevailing party because it allows the court just to decide that the party who wins the dispute instituted by reason of default, I'm not in default, gets attorney's fees without having to prove. And a prevailing party provision, you get into all those other issues of did you prevail because you said you was a default under the lease and you wanted me to pay $800, but at trial you won $600. Here, the issue is that the prevailing party is – defaulting party is more generic. It's whatever party claimed the other party was in default, if you successfully defend, you could win. But the other important issue is 58 Swansea was in default here. The key – the reason that the court found that Gator did not have to sign the 3N agreement was because Gator learned during the entire relevant time, which is September 2015 to the end of October, when 58 Swansea was saying, Gator, you need to sign this 3N agreement, during that entire time, they had not put Gator's name on the insurance agreement as the court found. That was a breach. They were in default of Article 4, Section 2 of the ground lease by not naming them as a named insurer. You still don't seem to be staying with the language of your own agreement. You're the landlord, right? Your client's the landlord. Yes. So if landlord shall incur any reasonable attorney's fees in defending – that's the point you stress, in defending – any action instituted by reason of default of the other, then you get attorney's fees. But you're saying that this was instituted by reason of an allegation of default by the landlord and the landlord won. So that would be a prevailing party clause. But this wasn't instituted by reason of default of the other. You've got a problem there with your own language. No, it was – the way I would read that is it's instituted by the plaintiff, reason of default of the other would be defendant, and defendant successfully defends. It says if landlord by default of the other. But let's turn to the second issue is that 58 Swansea was in default here because they did not name Gator as an additional named insured on the policy as required by Article 4, Section 2. That's why that – and that defense, they basically proved the default, and that's why they were in default. The judge comes along. He doesn't disagree they were in default during that time. What he says is in Article 12, we cured the default. And therefore, having cured the default in Article 12, we – How was the lawsuit instituted by reason of that default? The lawsuit was instituted by reason of Gator's claim default. But the defaulting party at the end of the litigation turned out to be 58 Swansea because they defaulted. But you've got to show it was instituted by reason of Swansea's default for you to recover any fees. Well, if the action is instituted because 58 Swansea sued by reason of default, they said that Gator was in default. But how – the problem here is that there would be – if you read the entire lease, there would be no way for the kind of – here the party who's in the right, the landlord, to recover. Sure. As lawyers are constantly proving, language is not usually very precise. There's always opportunity to argue the other side, or at least often enough to earn a good living for lawyers. This isn't entirely clear either way. Judge Stern seems to have made a rather practical determination that this didn't look like a classic case for attorney fee switching. You can argue the language both ways, obviously. He took exactly the same approach on the tolling issue in which he said, look, there's some courts that disagreed with this, but this is sort of part of a sensible issue to carry along, and told the statute. And he looked at both issues essentially in the same way. You can argue either side. Let's make a practical judgment. There's no great harm in the tolling. You're pushing the clause too far in his view. I'm not arguing he was right or wrong. I'm just saying he basically – you can argue these things both ways as to both. There are a couple of courts of appeals that disagreed with him on the tolling. But he was taking essentially a consistent approach in saying the tolling thing is a technicality. Some other courts disagreed, so what? And he's taking the same position here. This doesn't look like it's perfectly tailored for your case, but you can argue it both ways. He seems to me to be rather consistent. I'm not saying he's right, but it's an approach to a problem which has some appeal. I would just quickly say, because I know my time is up. No, no, I'd like the answer. In response to that, Judge Stearns didn't quite take the same approach. He reached into Article 12 to find a definition of default and cure that he found. He does not dispute that the 58 Swansea was in default, but he says they don't get attorney's fees because after the fact, October 30th, after the dispute that we then litigated for three years continued. I wasn't defending the verbiage. That was a mistaken use, and that Article 12 goes to termination to prevent termination. There can't be a right to cure. Finally, under Article 27, 58 Swansea chose to continue the dispute. They didn't really cure. They only cured under the protest. Thank you. Mr. Pollack, good morning. Good morning, Your Honor. May it please the Court, Barry Pollack, Pollack, Solomon, Duffy, on behalf of 58 Swansea Mall Drive LLC, I want to quickly address a couple of things that weren't mentioned about fees and then really focus on the late privilege waiver because that affected the judgment below. In Section Article 13, the reference to defaulting party, I think one has to look at what Judge Stearns found, which was that Gator in Paragraph 11 of the ultimate findings found that Gator did not prove 58 Swansea was a defaulting party. This follows on findings about both maintenance and insurance proceeds that relieve 58 Swansea of any finding of default. In part, the Court found in Paragraph 65 of its findings the fact that, and this is going to go into the Article 3 and interpretation, but found that both United Bank and 58 Swansea had acceded to all of the demands regarding insurance proceeds by Gator. That becomes an important fact through the late privilege waiver and how the Court reached a different interpretation of 3N than in its initial findings. But Gator has not challenged the specific finding by Judge Stearns that Gator did not prove either a maintenance default, instead detailed maintenance requests without use of the notice of default, and that a notice of default about insurance proceeds was never issued by Gator. Under Article 12, even under the first sentence of Paragraph 1B2 to Romanet I, the definition of default requires notice and a failure to cure within 10 days. It's only the next sentence of Paragraph 1B2 of Article 12 that says, for purposes of this subparagraph, any diligent efforts told this matter. So even without that clause, when one focuses on the first sentence, there's just no default here. We think, and we've laid it out in the brief, why that clause in the second sentence doesn't help Gator either. I would also say the last comment made by counsel was with regard to Article 27. 58 Swansea never invoked Article 27 below. That's a new argument by Gator that 58 Swansea invoked that somehow and was not pursuing a theory that it paid some extra maintenance costs at trial or otherwise. What it was saying was that shell upon request in Article 3N meant shell upon request as the court found below at the summary judgment stage. So on the ninth and final day of trial, and this was result determinative, the court allowed Gator to waive attorney-client privilege on the stand. Not the night before with notice, not the week before trial, but literally on the ninth and last day of trial. Not only in an implied way, but an express waiver. In most of the cases that come to this and other appellate courts regarding a late waiver with a failure to give discovery that's required due to the waiver of privilege, the courts first have to grapple with, was there really an implied waiver? Well, here my objection below was sustained by the court when Mr. Chandler, the general counsel of Gator, was asked what his understanding of Section 3N of Article 6 was until the court prompted defense counsel by saying, and this is quoted in our brief on page 15 of our opening brief, the colloquy, but the court asked, unless you're waiving privilege, at which point defense counsel said, yes, we are. You know, let's assume for, hypothetically for a minute, that it was error for the court to both allow them to waive privilege after having asserted it throughout the whole scope of litigation and then simultaneously not allow you to go back and do the discovery you might have done had they. I then read all the testimony that the lawyer gave and I had trouble finding in it anything that he said that met two criteria. One is it was privileged, so therefore it wouldn't have been in but for the waiver. And secondly, it made a difference in the judge's opinion. So can you point to me anything in the lawyer's testimony that met those two criteria? Absolutely. Even through, and it's important to compare this to what occurred during discovery as well, but Mr. Chandler through depositions, as I pointed out to the court, on that last day of trial when Mr. Chandler and Gater waived attorney-client privilege expressly, testified to an understanding that Gater had of 3N and 3I, questions he would not answer. This is how I understood the stuff. That's not privileged and it's also not relevant how he understood it. Well, I don't think that's right, Your Honor, because what someone's understanding is, who's the general counsel of a company, is informed by his legal knowledge, the advice he's given, and the outside counsel has given advice to him. It might be, it might not be. No one asked him if it was understood because he was parroting what someone told him. He was just asked, what's your understanding? At the time of discovery, he was asked questions and he routinely invoked those. I'm asking you to focus on the trial testimony because I looked pretty hard to see if there was anything that met those two criteria, but you understand the case better than I do. So, well, Your Honor, even the understandings of these are important and becomes compounded by the court's ultimate ruling when no party asked for this interpretation that whether Gater reasonably believed it could face future litigation was what 3N meant. Now, when you combine that with the factual finding that United Bank and 58 Swansea conceded to all demands about the insurance proceeds, those two findings together, paragraph 65 of the findings of fact and the concept of reasonable belief for future litigation, means that what the court did was hear from Mr. Chandler, made an assessment of him as the lawyer, and whether or not he reasonably believed that his part at Gater resulted in finding that it reasonably. You're overlooking the fact he had lots to say as the chief negotiator. He had lots to say, both about his communications with the other party and his own understandings. And so just telling me that the judge listened to his testimony doesn't get you anywhere. You've got to really point us to some testimony that he gave that he couldn't have given but for the waiver and that that testimony affected the outcome of the case. So, Your Honor, I come back to the understandings of those provisions. And I really want to stress that with the final finding So let me make sure I understand what you're saying. You're saying that he was asked questions about how he understood certain language in the agreement. And that's what you're saying was privilege? In fact, Judge Stearns initially sustained the objection to that as privilege, and it was consistent with what we were and weren't permitted to get. And here's what, Your Honor, the interpretation the judge gave to 3N, after trial as opposed to what it gave at summary judgment, introduces the concept of a reasonable But that's it. You know, it's the only testimony you're relying on to say that it was privilege testimony that could not have been given but for the waiver and was outcome effective, is the lawyer's, the chief negotiator's understanding of the language. I believe he also testified to an interaction with Mr. Goldsmith, the CEO, and how they interacted together on this issue to share the belief which, in essence, reveals privilege information which forgives Mr. Goldsmith for positions he would take. So many litigants would like to go into court, whether in a bench trial or jury. And now you're off to this general stuff again. So you've given me one other thing, the conversation with Goldsmith, but you haven't said that even approached the second criteria, which is that the judge relied on that particular testimony regarding Goldsmith for his decision, which is not matching up the two. Here's why, in paragraphs 2 and 3 of the ultimate findings, when the court reaches a decision that Gator reasonably believed that it would face future litigation, if that were the standard to begin with and Gator defended itself that way, which it did not, it did not actually raise that pretrial, that would have been an implied waiver of privilege and we'd still get discovery. So before the court could actually make a finding that Gator reasonably believed that it faced future litigation, in spite of the finding in paragraph 65 of the findings of fact that 58 Swansea and United Bank exceeded to all demands about insurance proceeds in the 3N letter, 58 Swansea should have had discovery of communications with outside counsel and Mr. Chandler regarding those issues because a party's reasonable belief that's based in part, even in part, on the general counsel's view or outside counsel's view, or even if I tried to say my client has a reasonable belief in this issue, that can imply the way of privilege. Here there was an express waiver of privilege. So we are deprived of discovery that inherently prejudiced us. Once there was an express waiver, we're entitled to see what that discovery, how that would change the case. In essence, it's inherent prejudice because we were not able to assess that pretrial. We were not able to develop a response to whether or not Gator reasonably believed in the prospect of future litigation. I read the court's opinion. Wasn't it undisputed that Gator was not listed as a named insured under the policy and that your client actually then sent an email saying no how, no way, never going to happen? That's not entirely correct, Your Honor. If I can correct that. First, there was a certificate of insurance issued by Lockton, the broker, that named Gator as an additional named insured. It turns out the way the evidence looked at trial, and I think this is what the court said, is that Lockton itself had not obtained the endorsement from Zurich, the insurance company. Lockton probably put Lockton on the hook for it because he issued a certificate of insurance. But it's correct that Zurich did not have them listed as a named insured. Zurich did not until late October. Okay. And is it also correct that your client sent an email saying no how, no way? As additional insured, not additional named insured as its interest may appear. They're two different concepts, Your Honor. So one's the ground. Less than? No, not in every respect, Your Honor. Not at all. In fact, as an additional named insured, you're entitled to notice not necessarily any of the proceeds, the way most jurisdictions interpret it. With an additional insured, you end up with co-equal rights in many jurisdictions and under many policies. Of course, this is policy specific, and this was in the 1980s when this lease was written. But what Mr. – there were communications that went back and forth about the difference between additional insured, not about the difference, but they used those terms as if they were interchangeable when they were not. The email that followed, that followed the court's finding in paragraph 65 of the findings of fact, was that United Bank of 58, Swansea, acceded by October 21st to all of Gator's demands. And Gator did not come back and say, well, now Mr. Corwin says we'll never be an additional insured, so you've got to fix that somehow in a 3M letter. That did not happen. Instead, and this comes up in every one of Gator's proposed 3M agreements, they tack on subordination rights beyond that which they're entitled to, prevailing party rights, as if there would be a full fee-shifting provision with the bank, not what the lease says, while the bank testifies, undisputed, that its goal always was to just stand in the shoes of 58, Swansea. Remember, under Article 24, this was a 55-year lease with renewals. It would run through 2039. Under Article 34, the buildings were owned by 58, Swansea. The fact that Article 4 says insurance, that Gator must be named on insurance policies as an additional named insured, as its interests may appear, is pretty slim in terms of any rights Gator would have to any proceeds for any destruction to the building that's being insured, because it wouldn't have those buildings until 2039. It's not the realistic effort through this, and what we say is the court wrongfully created a standard about what reasonably could be believed about future litigation, which is why every contract, that's the language the court used, and it's what every contract is created for. Every party would like to walk into court and say, I'm right because my attorney says so, or here's my attorney. He's going to testify, which is what Mr. Chandler did, and say, this is how we view things. I'm a lawyer. This is how we view things, and by the way, I also talked to Mr. Goldsmith, and this is how we view things, and then the court finds a reasonable belief. If the case had been litigated that way from the beginning and this had been a defense raised by Gator, then we would have argued implied waiver a lot earlier, and we would have either been entitled to the discovery, which we were at trial when there was an express waiver, and we would actually see what we would suspect based on some other discovery of Mr. Chandler as a business person, which was only through repeated motion practice, getting instructions from Mr. Goldsmith, that Gator would follow the lease if 58 Swansea agrees to something that Gator's not entitled to, literally in an e-mail. Well, we think we're entitled to see the e-mails between Gator and outside counsel on 3N, and we're entitled to see the communications between Mr. Chandler and Mr. Goldsmith that were withheld before this express waiver that was used by the court in order to find what Gator reasonably believed while all that information was withheld from us. Entitled doesn't necessarily mean that what was said suggests a significant likelihood you'd be helped. Oh, but parties never know what's in the withheld documents. I know that. I know that. There's a difference between pointing to something and saying, look, here's a major piece of information, would have changed the case or created a likelihood of a change in the case. I'm not arguing technically the standard. I'm just saying there's a difference between saying we have a right to look into this and saying here's something that looks to the court like it might have changed the case. But we do have that in the sense that we see early on, and the court finds this, that at least initially Gator was trying to get this out parcel, was holding 58 Swansea hostage by saying so that's what was happening in the document they initially withheld. We had a move to compel, a move to enforce. What's the relevance of that? The relevance of that is that, may I just answer that question, Your Honor? You've got to answer it. Thank you. I saw my time was up. I know, but you've got to answer it. Thank you, Your Honor. The relevance of that is the nature of the relationship and what Mr. Chandler was trying to accomplish for Gator. In a group of documents that have been withheld during those weeks about what Gator really thought about 3N and how much it wanted that out parcel or how much it was really just trying to get something else from 58 Swansea to which it was not entitled. We suspected that. We knew it based on timing before even getting that email between Mr. Goldsmith and Mr. Chandler, which was withheld. There was an argument to keep the in-camera inspection away from Judge Stearns. He did that inspection. I think what happened here, Your Honor, was at the end, Judge Stearns deferred to some level of attorney protectionism and Mr. Chandler, at the end of a trial, let him testify and found, no, the lawyer did what lawyers do, and that's unfair without giving 58 Swansea access to what was really being communicated by the parties that would inform a court's proper finding about whether or not Gator reasonably believed in the prospects of future litigation. How about saying instead that Judge Stearns looked at it and didn't think it was very promising? There's nothing in the record that would suggest that. No, I understand that. It's the way he operates, the rather commonsensical approach of assigning a degree of probability to something to which no mathematician can testify. And it's an instinct. You get better at it as you do more of it. And that doesn't mean you're right or wrong. It just means you can argue about it. That's why courts find inherent prejudice when attorney-client privilege is used as both a sword and shield, as it was here, deprive us of discovery, then throw it in at the end. And fortunately for Gator's sake, Judge Stearns changed something to a reasonable belief standard that allowed them to use that. Thank you, counsel. Briefly, Your Honors, Judge Kayada's question implies correctly that Mr. Shandler didn't testify to anything that was privileged and nothing he said was determinative in the outcome of the case. The case turned on the fact that Gator and United Bank both wanted, both required first priority to the insurance proceeds. That protects, under the lease, Gator's collateral is protected because the building exists. That's how it gets its rent. Do you agree that the judge vindicated your party on the other side's claim based on a sense that there was a subjective good-faith worry about the insurance proceeds and that was what was motivating that? We would say it was an objective good-faith worry. Well, so I think his point then, if I understood, is a little bit more refined than what I was getting at or what you were saying. I think his point is that given that that's the way the case came out after hearing the lawyer, it's putting at issue the subjective good-faith of your client and the best place to look to see what was really going on was the communications between Goldsmith and Shandler, which they never got to look at. But you got the benefit of putting Shandler's version of his view out there without them being able to test to see if that was really what was driving the client. I think that's the argument on your end. It could be, but the judge did say that those documents could be produced and Gator's lawyer said there are no such documents exist. And Judge Stern said, there you go, there's no documents. And he did say they could be produced. But still, because it was still an objective, the judge didn't find subjectively, he didn't care whether Gator was actually worried about it. He just said objectively it was reasonable, especially when they found out they weren't named insured. As to the Article 13 interpretation, yes, it could be decided both ways. But the word defending must mean something. And in this case, we have both parties, 58 Swansea in the counterclaim that Gator brought on the pylon. They prevailed. They won. There was no claim that Gator had defaulted at all. But they said that they were entitled to attorney's fees, and they've maintained that throughout the case, that they're entitled to attorney's fees for having prevailed as a defendant against the claim that they were in default. The judge found they were not in default because under the lease, he said maybe common law, but it's not the lease. He was incorrect in that, and we've appealed that because anything reserved in the lease would be under that. But where you're interpreting a lease where both parties agree with the interpretation that the defendant is entitled to attorney's fees, the successful defendant, when they're sued for their default, the court should not go beyond what both parties' understanding of the agreement is. Why? Do judges do that all the time? Well, because it – This isn't a criminal trial. We're not stuck with what the parties argue. We decide things all the time, which neither party agrees with. Well, if there's some issue of ambiguity or whatever, you have both parties agreeing on how to interpret it. I don't get into an argument, but I've been watching this stuff for about 60 years, and judges are constantly disagreeing with both parties and deciding in a third way. It's a wonderful feeling. Thank you. That is true. I would just urge that this is a – that's true in general, but as a contract case, it's what the parties to the contract think has some bearing. Some bearing. Thank you. Thank you.